UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEATHER HULON, as Personal
Representative of ANTHONY HULON,
Deceased,

      Plaintiff,

v.

CITY OF LANSING, a municipal
corporation, DARYL GREEN in his
official capacity, BILLY WINDOM,
in his official and individual capacity,
EDGAR GUERRA, TREVOR ALLMAN
CHARLES WRIGHT, and GARY
WORDEN, in their individual
capacities,

      Defendants.

Case No. 20-
Hon.

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

_____/

JENNIFER G. DAMICO (P51403)
BUCKFIRE LAW FIRM
Attorneys for Plaintiff
29000 Inkster Road, Suite 150
Southfield, Michigan 48034
(248) 569-4646
Fax (248) 569-6737
jennifer@buckfirelaw.com
_____/

NOW COMES Plaintiff, Heather Hulon, as Personal Representative of the Estate of Anthony Hulon, deceased, through her attorneys, Buckfire Law Firm, and for her Complaint against the above-named Defendants, states as follows:

1.      This is a wrongful death action brought by Plaintiff in her representative capacity against Defendants for money damages pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, against Defendants, City of Lansing, City of Lansing Chief of Police, Daryl Green, in his official capacity, City of Lansing Police Department employees, Sergeant Billy Windom, in his official and individual capacity, Sergeant Edgar Guerra, patrol officer Trevor Allman, and detention officers Charles Wright and Gary Worden, in their individual capacities, and state law claims against all Defendants.

2.      This court has jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and 1988 claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This court has jurisdiction over Plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 18 and 28 U.S.C. § 1367.

4.      Venue lies in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b).  The unlawful actions alleged in this Complaint took place within the City of Lansing, in Ingham County, located within the Southern Division of the Western District of Michigan.

5.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

## PARTIES

6.     Plaintiff, Heather Hulon, is the duly appointed Personal Representative of the Estate of Anthony Hulon, deceased ("Hulon" hereinafter), and at all times relevant to this action is, and was, a resident of the State of Arizona.

7.     Defendant, City of Lansing ("City"), is a Michigan municipal corporation and is the body responsible for the control and oversight of its departments, agencies and facilities, including the Lansing Police Department, as well as its sworn police and detention officers, including Defendants, Daryl Green, Billy Windom, Edgar Guerra, Trevor Allman, Charles Wright, and Gary Worden.

8.     Defendant, Daryl Green ("Green"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Green is sued in his official capacity as the Chief of the Lansing Police Department, and final policy-maker, employed by the Defendant City and/or the Lansing Police Department ("LPD" or "Department" hereinafter).

9.     Defendant, Billy Windom ("Windom"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Windom is sued in his official and individual capacity as a sergeant, shift commander and/or shift

sergeant, for the Defendant City, was employed as a sworn detention officer by the Defendant City, and was in the scope of his employment.

10.    Defendant, Edgar Guerra ("Guerra"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Guerra is employed as a sworn detention officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

11.    Defendant, Trevor Allman ("Allman"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Allman is employed as a sworn police officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

12.    Defendant, Charles Wright ("Wright"), is and at all times relevant, was a resident of the State of Michigan.   Defendant Wright is employed as a sworn detention officer by Defendant City, was in the scope of her employment, and is being sued in his individual capacity.

13.    Defendant, Gary Worden ("Worden"), is and at all times relevant, was a resident of the State of Michigan. Defendant Worden is employed as a sworn detention officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

14.    Defendants, Green, Windom, Guerra, Allman, Wright and Worden, at all times relevant to this action, were acting under the color of state law in their capacities of LPD police and/or detention officers.

15.    On April 10 and 11, 2020, the individual Defendants were on duty and acted in concert with each other to cause the wrongful death of Plaintiff's decedent and then conspired to distort and conceal the actual facts and circumstances regarding his death.

16.    The individual Defendants acted mutually to achieve the resulting injuries, death and distortions.

17.    Hulon died on April 11, 2020 as a result of the conduct of the Defendants who caused him to asphyxiate and suffer cardiac arrest and anoxic brain injury as a result of the use of extreme excessive force, blunt trauma and the use of restraints.

18.    In accordance with the provisions of MCL § 600.2922, a wrongful death action inured to Plaintiff, as Personal Representative of the Estate of Anthony Hulon, her brother.

19.    In further accordance with the provisions of the Michigan Wrongful Death Statute and/or Survival Statute, Plaintiff is entitled to certain damages including but not limited to:

     a. Reasonable compensation for funeral, medical, and hospital expenses for which the Estate is responsible;

    b.  Reasonable compensation for the pain and suffering undergone by the deceased during the intervening time between initial injuries until death;

    c.  Loss wages, future earning capacity, financial support and other tangible items of economic value; and

    d.  Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which Hulon's heirs-at-law and next-of-kin are respectfully entitled to and any other damages as may be fair and just.

20.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowable under federal law, including all damages stated in Paragraph 19, punitive damages against the individual Defendants, and costs, interest and attorney fees against all Defendants.

## SPECIFIC ALLEGATIONS

21.    Plaintiff incorporates paragraphs one (1) through twenty (20) as though fully stated herein.

22.    Based upon the records, on April 10, 2020 at approximately 12:50 p.m., the LPD arrived at the home shared by Plaintiff's decedent, Hulon, and his roommate, "RW", at 727 N. Pennsylvania Ave., Lansing, MI, in response to a 911 call.[1]

23.    RW told the responding officers that Hulon punched him in the face 5 times while he was sitting on the couch and then punched him another 8 times.

24.    Hulon denied that he punched RW.

---

[1] RW's identity will be disclosed privately.

25.    Hulon, however, could not explain to the officers how RW sustained a bruised and bloody eye.

26.    According to the records, Hulon was arrested for simple domestic assault, and transported to the Lansing City Jail or "Jail" for processing.

27.    Hulon was booked into the Jail at approximately 1:50 p.m.

28.    According an incident report written by Defendant Worden:

"Hulon was visibly under the influence of narcotics believed to be meth. Hulon was escorted to cell 6-3 without any issues.  Hulon then started taking clothes off and was pacing the cell and yelling.  Hulon's behavior continued for approx. 8 hrs at which point Hulon stated he was very sweaty and hot.  Sgt. Windham [sic] notified dispatch to have LFD and an Ofc transport Hulon for medical evaluation."

29.    Hulon was transferred to Sparrow Hospital by officer Ricky Spratt and arrived in the emergency department at 10:13 p.m.

30.    According the medical records, Hulon admitted to using methamphetamines but was "worried that there were possibly other substances in the drug."

31.    Hulon told the medical professionals at Sparrow Hospital that he last used methamphetamines the night before his arrest.

32.    Hulon's urine analysis was positive for methamphetamines and ecstasy.

33.    According to the medical records, Hulon was agitated and actively twitching, which was noted as "involuntary."

34.    Further according to the medical records, Hulon was alert and oriented, speaking in full sentences, well-nourished, well-developed and in no distress.

35.    After an examination and urine drug screen to rule out a drug overdose, Hulon was administered 3 milligrams of Ativan over the course of his 2 ½ hour stay in the hospital.

36.    At approximately 12:25 a.m., Hulon was medically-cleared, discharged from the hospital and released back into police custody.

37.    Sometime prior to 12:25 a.m., Defendant Allman relieved officer Spratt at Sparrow Hospital.

38.    According to Defendant Allman's written report, while at Sparrow Hospital, Hulon told him "that he took meth on Thursday, he took a nap and when he awoke, he couldn't stop moving."

39.    Defendant Allman further wrote that Hulon was "thrashing" in his bed and that Hulon told him he was not doing it on purpose.

40.    Defendant Allman further wrote in his report that the nurse and officer Spratt told him that Hulon had been thrashing around and moving constantly for the past 2 ½ hours.

41.    According to Defendant Allman's report, Hulon would not cooperate and walk to his awaiting patrol car.

42.     Defendant Allman called for backup to assist in transporting Hulon back to the Jail.

43.     Two LPD officers, Katelyn Miller and De'Jeeiare Davis, responded, and assisted Defendant Allman in transporting Hulon.

44.     The officers noted in their respective reports that they "applied pressure" to in order to gain control Hulon.

45.     Ultimately, a wheelchair was used to transport Hulon to the patrol car.

46.     In his report, Defendant Allman admitted to using force to purportedly keep Hulon in the wheelchair.

47.     While putting Hulon into the patrol car, Defendant Allman wrote that Hulon was still uncooperative, and he again, used force to get him into the car.

48.     Defendant Allman also wrote in his report that Hulon was uncooperative during the ride back to the Jail.

49.     Hulon was lying down in the back seat, and Defendant Allman was unable to secure him with a seatbelt.

50.     In his report, Defendant Allman wrote that he attempted to turn on his in-car camera that would have recorded (audio and visual) Hulon in his vehicle, but "it would not load."

51.     Defendant Worden met Defendant Allman and Hulon at the sallyport entrance of the Jail.

52.    Defendant Allman wrote that because Hulon's arms and legs were shaking erratically, he thought it would be easier and safer to use the wheelchair instead of walking.

53.    According to Defendant Allman's report, as Hulon attempted to sit in the wheelchair, it rolled backwards and Hulon almost fell out of it.

54.    At that point, Defendant Allman wrote that his body worn camera ("BWC") "fell off."

55.    Defendant Allman wrote that Hulon would not place his feet on the foot rest and slid forward almost falling out of the wheelchair.

56.    Defendant Allman then "assisted" Hulon back into the wheelchair.

57.    Upon information and belief, Defendant Allman used unreasonable and excessive force on Hulon when he transferred him back to the Jail, and intentionally failed to record it on his BWC and his in-car camera.

58.    According to the video, at 1:04:25 a.m., Defendants Worden and Allman escorted Hulon to cell 6-2 with his hands cuffed behind his back and his ankles shackled.

59.    It is uncontested that Hulon was an unarmed detainee in police custody.

60.    Defendants Wright and Guerra entered cell 6-2 with Defendants Worden and Allman.

61.     According to the LPD policy manual, cell 6-2 is an "observation cell."
All actions were recorded inside of the cell.

62.     Defendant Windom was the Jail supervisor or Sergeant on duty on April
11, 2020, when Hulon returned to the Jail from the hospital.

63.     From the records, Defendant Windom observed the activities inside of
cell 6-2 from the "main lockup work area."

64.     Defendant Windom wrote:

"It appeared to me from the video feed that his "tweaking" was worse than
when I had him sent to Sparrow.  Hulon was taken directly back to cell 6-2
with Sgt Guerra, Officer Alman [sic], and detention officers Wright and
Worden.

The decision was made by the staff dealing with Hulon to place him in a
restraint belt.  I was observing from the main lock up area on the video as
someone has to stay in the work area to monitor the other inmates."

65.     At 1:04:33 a.m., while Defendants Allman, Worden and Guerra held
Hulon, who was handcuffed with his hands behind his back, Defendant Wright
unshackled Hulon's ankles.

66.     Hulon who was visibly under the effects of methamphetamines and
ecstasy ("drugs" hereinafter), was combative, struggling, panting, and complaining
of pain, stating: "you're hurting my hands. . ." and "It hurts bad . . ."

67.     From the video, Hulon appeared to have injuries to the right side of his
head, brow and cheek.

68.     At 1:05:30 a.m., a Defendant officer instructed Hulon to get on his knees.

69.     Hulon, who was clearly and objectively in a state of excited delirium due to drugs, did not comply with the officer's instructions.

70.     At 1:05:14 a.m., Defendants Worden, Allman, Wright and Guerra forced Hulon face down, onto his chest, and onto the ground.

71.     Hulon's hands were cuffed behind his back.

72.     Defendant Allman held down Hulon's knees, legs and feet.

73.     Defendant Worden held down Hulon's upper body by compressing his neck, chest and torso, while Defendant Guerra attempted to remove Hulon's hand cuffs.

74.     At 1:05:42 a.m., a gasping Hulon said: "I can't breathe . . .can't breathe . . ."

75.     At 1:06:04 a.m., Defendant Wright joined Defendants Worden and Allman, and held Hulon down by kneeling on the middle of his back, then rolling forward, so his full body weigh was compressing Hulon's chest and torso.

76.     At 1:06:08 a.m., Hulon said: "I'm passing out . . ."

77.     At 1:06:16 a.m., from the video, Defendant Worden, holding Hulon down by his neck and shoulders, extended his left leg out, braced it on the ground,

and applied additional compressional force upon Hulon, who was panting, grunting and struggling to breathe.

78.    At 1:06:59 a.m., a breathless Hulon uttered: "I can't breathe, I really can't breathe now . . . "

79.    At 1:07:00 a.m., Defendant Guerra began to replace Hulon's handcuffs with a waist restraint belt while the other Defendants continued to pin him to the ground on his stomach and chest, compressing his lungs and restricting his ability to breathe.

80.    Hulon was panting and gasping for air.

81.    From a review of the video, 1:07:04 a.m., was the last voluntary movement from Hulon.[2]

82.    The Defendant officers continued to pull, tug and tighten the waist restraint belt on a motionless Hulon, who was agonal breathing, i.e. the last breaths before death.

83.    At 1:09:54 a.m., the last sounds were heard from Hulon as captured on the audio recording from cell 6-2.

---

[2] In his report, Defendant Windom wrote: "Hulon was face down with the staff attempting to put the belt on him.  I noticed Hulon stopped resisting.  The staff working with him turned him over and sat him up"

84.    At 1:10:24 a.m., the Defendant officers, still restraining Hulon face-down with their cumulative body weight, finally secured the restraint belt around a motionless Hulon's waist.

85.    According to the video, the Defendant officers rolled Hulon on his side at 1:10:37 a.m.; 3 ½ minutes after his last movement.

86.    Hulon was face down on his stomach and chest, for 5 minutes and 23 seconds.

87.    During that 5 minutes and 23 seconds, Hulon was forcefully held down by at least three (3) of the four (4) Defendant officers in cell 6-2.

88.    At 1:10:40 a.m., one of the Defendant officers asked: "Is he sleeping?"

89.    Hulon was not breathing.

90.    At 1:11:33 a.m., Defendant Allman checked to see if Hulon was breathing or had a pulse.  Upon discovering that he had neither, Defendant Allman requested a medic.

91.    After the Defendant officers discovered that Hulon was not breathing, and did not have a pulse, they unreasonably delaying in starting CPR.

92.    The video further shows that once the Defendant officers started CPR, they did it incorrectly, failing to give any rescue breaths when eight (8) were advised by the AED machine.

93.    The Defendant officers did not perform any rescue breathing on Hulon.

94.     The first responders arrived at cell 6-2 at 1:19:18.

95.     During the approximately 8 minutes from the time that the Defendant officers determined that Hulon was not breathing and had no pulse, to the time that the first responders arrived, no Defendant officer performed any rescue breathing and/or administered any oxygen.

96.     The first responders attempted life-saving measures, but according to the records, by the time Hulon arrived at the emergency department, he had been without a heartbeat for 38 minutes.

97.     Hulon never regained consciousness.

98.     Hulon was pronounced dead at 2:12 a.m. at Sparrow Hospital.  He was 54 years old.

99.     The medical records state that Hulon suffered cardiac arrest and anoxic brain injury.

100.    The medical records further note: "Per EMS, patient got into an altercation with police in custody.  Patient was placed in waistband restraints, became unresponsive.  Bystander CPR was immediately started."

101.    The Ingham County Medical Examiner listed his cause of death as positional asphyxia.

102.    The Medical Examiner further listed the manner of death as homicide.

103.    Further the Medical Examiner noted the following blunt force injuries:

a.   Abrasion of the right forehead;

b.   Contusion of right brow;

c.   Abraded contusion of the right cheek;

d.   Subcutaneous contusion of right lower back;

e.   Abrasions of wrists and ankles (consistent with restraint injuries); and

f.   Scattered additional abrasions and contusions of torso and extremities.

104.   Upon information and belief, the Michigan State Police recommended that criminal charges be filed by the State of Michigan Attorney General against the four (4) officers involved in this unconstitutional restraint and use of force against Hulon; a homicide.

105.   Defendants, Windom, Guerra, Allman, Wright and Worden, are not entitled to qualified immunity as Hulon's right to be free from excessive force and cruel and unusual punishment, was unequivocally established, and the amount of force used was clearly excessive based upon the totality of the circumstances.

106.   The prohibition against creating asphyxiating conditions by applying substantial, significant, or prolonged pressure upon an unarmed, handcuffed, detainee, who presents a minimal safety risk was clearly established in the Sixth Circuit as of August 2007 in *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007).

107.   In addition to failing to supervise and monitor his subordinate Defendant officers during the incident, Defendant Windom, failed to intervene and to stop the use of excessive use of force that resulted in the death of Hulon.

00647933                                    16

108.    Further, the Defendant officers failed to timely and properly perform CPR and basic life support in violation of Hulon's constitutional rights as more fully explained below.

109.    The acts of the Defendant officers were intentional, malicious, reckless, grossly negligent, and undertaken with deliberate indifference to and callous disregard for Hulon's health and wellbeing, entitling his estate to punitive damages.

110.    The acts of the Defendant's officers were undertaken in conformity with the customs, policies and practices of the Defendant City's police department and administration, subjecting Defendant City and Green, the final policy maker, to municipal liability for failure to properly hire, train, supervise, monitor, staff and/or discipline the officers in the Department.

111.    The acts and omissions, *inter alia*, of the individual officers and the supervisory staff, including Defendants Green and Windom, leading to municipal liability are as follows:

   a.    Failing to train officers on the proper use of handcuffs and restraint devices and the known risks of positional and/or compressional asphyxia;

   b.    Failing to train officers on the improper restraint of detainees in a prone position, increasing the risk if injury and death by positional and/or compressional asphyxia;

   c.    After the jail death of Edward Swans, Jr., (which also occurred in cell 6-2) claiming to have an alleged training program regarding the proper use of handcuffs and restraint devices and

the known risks of positional and/or compressional asphyxia, but deliberately failing to implement it;

d.     Failing to properly train officers on the use of force continuum and on the principle that the elevation of the continuum must proceed on a careful and staged basis, with the use of force by the officers never more than one level of force above that demonstrated by the citizen who is the subject of government action, especially an unarmed detainee;

e.     Failing to properly train officers in basic life support and/or CPR;

f.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of deliberate indifference to detainees' serious medical needs by willfully and intentionally failing to perform CPR;

g.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of the use of excessive force, including officers' failure to intervene in excessive force, and improper restraint of detainees increasing the risk of injury and death by positional and/or compressional asphyxia;

h.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of the use waist restraints in jail cells on detainees for no legitimate goal or penological justification;

i.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of restraining detainees face-down in jail cells where they present no risk of harm to any officer, and serve no legitimate goal or penological justification;

j.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of intentionally turning off and/or failing to record incidents on BWC and/or in-car cameras;

k.     Condoning, authorizing, tolerating and/or ratifying a custom or practice of encouraging and permitting collusive statements by involved officers, including, but not limited to: failing to file

complete and accurate reports, filing false reports, making false statements, and obstructing or interfering with an investigation; and

l.    Any other custom, policy or practice that becomes known through discovery.

112.   These acts and failures to act pursuant to the customs, policies and practices of the Defendant City, its administration, LPD, and its individual officers, directly led to the use of excessive force against Hulon and deliberate indifference to his serious medical needs, in violation of his Fourth and Fourteenth Amendment rights to be free from excessive force, and inhumane conditions of confinement, giving rise to municipal liability which is not subject to qualified immunity.

## COUNT I

### 42 U.S.C. §1983 – VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS -EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE TO MEDICAL NEEDS CAUSING WRONGFUL DEATH

### (AGAINST DEFENDANTS WINDOM, GUERRA, ALLMAN, WORDEN, AND WRIGHT)

113.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

114.   At all times relevant, Hulon had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety

and bodily integrity, as well as protection from excessive force pursuant to the Fourth Amendment to the United States Constitution.

115.  As a pretrial detainee, the substantive due process clause of the Fourteenth Amendment further afforded Hulon the right to adequate medical care, and the deprivation of necessary medical care was an unconstitutional form of punishment.

116.  At all times relevant, as police officers acting under color of law, Defendants Windom, Guerra, Allman, Worden, and Wright ("Defendant officers") were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

117.  In violation of Hulon's clearly established, constitutionally-protected rights to be free from excessive force, cruel and unusual punishment, and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant officers subjected Hulon to excessive force and cruel and unusual punishment; thereby inflicting horrendous personal injuries upon him, including death.

118.  In violation of Hulon's clearly established, constitutionally-protected rights to be free from excessive force, cruel and unusual punishment and deprivation of life and liberty without due process of law under the Fourth and Fourteenth

Amendments to the to the United States Constitution, Defendant officers violated

Hulon's rights by the following conduct:

a. Defendant Allman, upon information and belief, struck Hulon in the head and face, sometime during the transport from Sparrow back to the jail and then either turned off and/or destroyed his BWC and/or in-car cameras and/or recordings;

b. Defendant officers made the decision to apply a waist restraint on Hulon, an unarmed detainee, for no legitimate goal or penological  purpose, the only purpose was to punish Hulon;

c. Defendant officers deliberately ignored Hulon's cries of pain and statements that they had hurt him when he was first moved back into cell 6-2;

d. Defendant officers restrained Hulon face down on his stomach and chest with his hands cuffed behind his back where they knew, or should have known had they been properly trained, would restrict his breathing, in in violation of Lansing Police Department Policy 500.3-Use of Handcuff and Restraint Devices;

e. While prone, Defendant officers applied their cumulative body weight upon him when they knew was "tweaking" from drugs, and knew, or should have known had they been properly trained, that their actions posed a substantially high risk of positional or compressional asphyxia and death;

f. Defendant officers failed to enter an ALERT in the jail record at the time of booking or during the 8 hours period when Hulon was allegedly "tweaking", for Sudden Custody Death Syndrome Risk or a "SCDS RISK" in violation of Lansing Police Department Policy700.31 – Alert Review at Booking;

g. Defendant officers continued the restraint of Hulon, in a prone position, despite him stating that he was "passing out" and "I can't  breathe" and "really can't breathe" for 5 minutes and 23 seconds;

h.    Defendant officers continued the restraint of Hulon, in a prone position, for after he had stopped moving and made his last agonal breath sound;

i.    Defendant officers willfully refused to perform rescue breathing for over 8 minutes in deliberate indifference to his medical needs in violation of Hulon's Fourteenth Amendment right to adequate and necessary medical care;

j.    None of the Defendant officers intervened or attempted to stop the restraint of Hulon, even after he said he was "passing out" and "I can't breathe" and "really can't breathe" for 5 minutes a and 23 seconds including Defendant Windom, who was watching the events in Cell 6-2 from the main lock up work area;

k.    Defendant officers wrote false and misleading reports in an attempt to cover-up and/or obstruct the investigation; and

l.    Any other conduct that becomes known through discovery.

119.    The above conduct in the foregoing Paragraph, was objectively unreasonable, constituted the use of excessive force, was cruel and unusual punishment, and reflected the unnecessary and wanton infliction of pain.

120.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendant officers are liable to Plaintiff for all damages allowable under federal law and Michigan damages statutes.  To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such in adequacies.

121.   The conduct of Defendant officers was and remains extreme and outrageous subjecting them to punitive damages.

122.   As a direct and proximate result of Defendant officers' violations of Hulon's constitutionally-protected rights, Hulon and Plaintiff suffered damages as more fully explained in Paragraphs seventeen (17) through twenty (20) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT II

### 42 U.S.C. § 1983 – MUNICPAL LIABILITY
### DELIBERATE INDIFFERENCE TO UNCONSTITUTIONAL CUSTOMS, POLICIES AND PRACTICES AND SYSTEMATIC FAILURE TO HIRE, TRAIN, SUPERVISE AND DISCIPLINE OFFICERS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

### (AGAINST DEFENDANTS, CITY, GREEN AND WINDOM)

123.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

124.   42 U.S.C. § 1983 states:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges or immunities secured by the
constitution and law shall be liable to the party injured in
an action at law, suit in equity, or other appropriate
proceeding for redress . . .

125.   Defendants, City, Green, and Windom, the final policy-makers and/or
supervisors, had an obligation to hire, train, supervise, and monitor, its agents and
employees, including the individual Defendants named herein, to ensure that the
constitutional rights of Hulon and similarly situated citizens were not violated.

126.   Defendants, City, Green and Windom, had an obligation to investigate,
report and discipline its officers for the use of excessive force, including the
individual Defendants named herein, to ensure that the constitutional rights of
Plaintiff and similarly situated citizens were not violated.

127.   Defendant Windom, the shift commander/supervisor, for the jail,
pursuant to the customs, policies and practices of the Defendant City, was
responsible for all decisions related to the use of detainee restraints in the Jail.

128.   Defendant Windom was responsible for ensuring that all detainees in
the Jail received appropriate medical treatment and was responsible for the safe and
humane treatment of all detainee pursuant to City of Lansing Police Department
Policy 500.4 – Detention of Adults and Juveniles

129.   With deliberate indifference to the rights of citizens to be free from
excessive force, and cruel and unusual punishment, the City of Lansing police and
detention officers, Defendants, City, Green and Windom, have ongoingly condoned,

encouraged, tolerated, ratified and acquiesced to a dangerous environment of police and jail misconduct stated in detail in Paragraph one hundred eleven (111).

130.   Defendant City's customs, policies and practices were a moving force behind the constitutional violations that caused Plaintiff's injuries and damages in Paragraphs seventeen (17) through twenty (20) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT III

## ASSAULT AND BATTERY CAUSING WRONGFUL DEATH

### (AGAINST DEFENDANTS GUERRA, ALLMAN, WORDEN AND WRIGHT)

131.   Plaintiff incorporates by references each of the allegations contained in the previous paragraphs as though fully set forth herein.

132.   Defendants, Guerra, Allman, Worden and Wright, made an intentional and unlawful threat or offer to do bodily injury to Hulon.

133.   Defendants' threat was made under circumstances that created in Hulon a well-founded fear of imminent peril.

134.   Defendants had the apparent present ability to carry out the act if not prevented.

135.   Defendants thereafter did complete the violent process.

136.   First, by Defendant Allman, upon information and belief, striking Hulon in the head and face, after leaving Sparrow Hospital, prior to returning to the Jail.

137.   Second, by Defendants during the unconstitutional restraint, use of excessive force, and ultimately Hulon's death by positional or compressional asphyxia.

138.   As a direct and proximate result of Defendants' assault and battery of Hulon, Plaintiff sustained the injuries and damages as fully explained in Paragraphs seventeen (17) through twenty (20) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT IV

## GROSS NEGLIGENCE, WILLFUL AND WANTON MISCONDUCT CAUSING WRONGFUL DEATH

## (AGAINST THE DEFENDANTS, WINDOM, GUERRA, ALLMAN, WORDON AND WRIGHT)

139.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein

140.   Defendants owed Hulon a duty to use ordinary care to ensure his safety and freedom from excessive force and cruel and unusual punishment, and other harms as described above.

141.   As Hulon had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection excessive force and cruel and unusual punishment, pursuant to the Fourth Amendment to the United States Constitution, the Defendant officers are not entitled to qualified immunity.

142.   Further, the Defendant officers are not entitled to governmental immunity under Michigan law, MCL §691.1407 *et seq*. as their conduct amounted to gross negligence, and/or willful and wanton misconduct.

143.   Defendants' conduct demonstrated a willful disregard for precautions to ensure Hulon's safety.

144.   Defendants' conduct demonstrated a willful disregard for substantial risk to Hulon.

145.   Defendants breached their duties owed to Hulon and were grossly negligent in that the acts committed by Defendants were done with reckless

disregard to Hulon's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to him.

146.   As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, state and federal law, Plaintiff suffered injuries and damages as fully detailed in Paragraphs seventeen (17) through twenty (20) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

a.   compensatory and consequential damages, allowable under the Michigan Wrongful Death Statute and/or Survival Statute;

b.   economic losses on all claims allowed by law;

c.   special damages in an amount to be determined at trial;

d.   punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

e.   attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

f.   pre- and post-judgment interest at the lawful rate; and

g.   any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

Respectfully submitted,

Buckfire Law Firm


By:     /s/ *Jennifer G. Damico*
        Jennifer G. Damico (P51403)
        Attorneys for Plaintiff
        29000 Inkster Road, Suite 150
        Southfield, MI  48034
        (248) 569-4646/ fax (248) 569-6737
        jennifer@buckfirelaw.com

October 26, 2020


## PLAINTIFF'S JURY DEMAND

Plaintiff, Heather Hulon, as Personal Representative of the Estate of Anthony Hulon, Deceased, by and through counsel, demand a trial by jury in the above-captioned matter.

Respectfully submitted,

Buckfire Law Firm


By:    /s/ *Jennifer G. Damico*
        Jennifer G. Damico (P51403)
        Attorneys for Plaintiff
        29000 Inkster Road, Suite 150
        Southfield, MI  48034
        (248) 569-4646/ fax (248) 569-6737
        jennifer@buckfirelaw.com

October 26, 2020