# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

HEATHER HULON, as Personal
Representative of ANTHONY HULON,
Deceased,

        Plaintiff,

v.

CITY OF LANSING, a municipal
corporation, BILLY WINDOM, in his
individual capacity, EDGAR GUERRA,
TREVOR ALLMAN, CHARLES WRIGHT,
and GARY WORDEN, in their individual
capacities,

        Defendants.

Case No. 1:20-cv-01023-PLM
Hon. Paul L. Maloney

<div style="border:1px solid">

**<u>SECOND AMENDED
COMPLAINT</u>**

</div>

_____/

JENNIFER G. DAMICO (P51403)
BUCKFIRE LAW FIRM
Attorneys for Plaintiff
29000 Inkster Road, Suite 150
Southfield, Michigan 48034
(248) 569-4646/Fax (248) 569-6737
jennifer@buckfirelaw.com

ANDREW BREGE (P71474)
ROSATI, SCHULTZ, JOPPICH AND
AMTSBUECHLER, PC
Attorneys for Defs. Lansing, Green
and Windom
822 Centennial Way, Ste 270
Lansing, MI 48917
(517) 886-3800/Fax (517) 886-9154
abrege@rsjalaw.com

NOW COMES Plaintiff, Heather Hulon, as Personal Representative of the Estate of Anthony Hulon, deceased, through her attorneys, Buckfire Law Firm, and for her Second Amended Complaint against the above-named Defendants, states as follows:

1.     This is a wrongful death action brought by Plaintiff in her representative capacity against Defendants for money damages pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, against Defendants, City of Lansing, Sergeant Billy Windom, in his individual capacity, Sergeant Edgar Guerra, patrol officer Trevor Allman, and detention officers Charles Wright and Gary Worden, in their individual capacities, and state law claims against all Defendants.

2.     This court has jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and 1988 claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.     This court has jurisdiction over Plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 18 and 28 U.S.C. § 1367.

4.     Venue lies in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b).  The unlawful actions alleged in this Complaint took place within the City of Lansing, in Ingham County, located within the Southern Division of the Western District of Michigan.

5.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs and attorney fees.

## PARTIES

6.     Plaintiff, Heather Hulon, is the duly appointed Personal Representative of the Estate of Anthony Hulon, deceased ("Hulon" hereinafter), and at all times relevant to this action is, and was, a resident of the State of Arizona.

7.     Defendant, City of Lansing ("City"), is a Michigan municipal corporation and is the body responsible for the control and oversight of its departments, agencies and facilities, including the Lansing Police Department, as well as its sworn police and detention officers, including Defendants, Daryl Green, Billy Windom, Edgar Guerra, Trevor Allman, Charles Wright, and Gary Worden.

8.     Defendant, Billy Windom ("Windom"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Windom is sued in his individual capacity as a sergeant, shift commander and/or shift sergeant, for the Defendant City, was employed as a sworn detention officer by the Defendant City, and was in the scope of his employment.

9.     Defendant, Edgar Guerra ("Guerra"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Guerra is employed as a sworn detention officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

10. Defendant, Trevor Allman ("Allman"), is and at all times relevant to this action was, a resident of the State of Michigan. Defendant Allman is employed as a sworn police officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

11. Defendant, Charles Wright ("Wright"), is and at all times relevant, was a resident of the State of Michigan. Defendant Wright is employed as a sworn detention officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

12. Defendant, Gary Worden ("Worden"), is and at all times relevant, was a resident of the State of Michigan. Defendant Worden is employed as a sworn detention officer by Defendant City, was in the scope of his employment, and is being sued in his individual capacity.

13. Defendants, Windom, Guerra, Allman, Wright and Worden, at all times relevant to this action, were acting under the color of state law in their capacities of the Mayor, LPD police and/or detention officers.

14. On April 10 and 11, 2020, the individual Defendants were on duty and acted in concert with each other to cause the wrongful death of Plaintiff's decedent and then conspired to distort and conceal the actual facts and circumstances regarding his death.

15.     The individual Defendants acted mutually to achieve the resulting injuries, death and distortions.

16.     Hulon died on April 11, 2020 as a result of the conduct of the Defendants who caused him to asphyxiate and suffer cardiac arrest and anoxic brain injury as a result of the use of extreme excessive force, blunt trauma and the use of restraints.

17.     In accordance with the provisions of MCL § 600.2922, a wrongful death action inured to Plaintiff, as Personal Representative of the Estate of Anthony Hulon, her brother.

18.     In further accordance with the provisions of the Michigan Wrongful Death Statute and/or Survival Statute, Plaintiff is entitled to certain damages including but not limited to:

   a. Reasonable compensation for funeral, medical, and hospital expenses for which the Estate is responsible;
   b. Reasonable compensation for the pain and suffering undergone by the deceased during the intervening time between initial injuries until death;
   c. Loss wages, future earning capacity, financial support and other tangible items of economic value; and
   d. Damages for the loss of continued love, society, companionship, comfort, affection, fellowship, aid and other assistance which Hulon's heirs-at-law and next-of-kin are respectfully entitled to and any other damages as may be fair and just.

19.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowable under federal law, including all damages stated

in Paragraph 18, punitive damages against the individual Defendants, and costs, interest and attorney fees against all Defendants.

## SPECIFIC ALLEGATIONS

20.     Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

21.     Based upon the records, on April 10, 2020 at approximately 12:50 p.m., the LPD arrived at the home shared by Plaintiff's decedent, Hulon, and his roommate, "RW", at 727 N. Pennsylvania Ave., Lansing, MI, in response to a 911 call.[1]

22.     RW told the responding officers that Hulon punched him in the face 5 times while he was sitting on the couch and then punched him another 8 times.

23.     Hulon denied that he punched RW, and based upon information and belief, the arresting officers were unsure if Hulon assaulted RW after speaking to witnesses.

24.     Hulon, however, could not explain to the officers how RW sustained a bruised and bloody eye, and pursuant to LPD policy, Hulon was taken into custody.

25.     According to the records, Hulon was arrested for simple domestic assault, and transported to the Lansing City Jail or "Jail" for processing.

26.     Hulon was booked into the Jail at approximately 1:50 p.m.

---

[1] RW's identity will be disclosed privately.

27.     The booking records and intake form are incomplete.

28.     The form regarding drug history including type of drug, amount used, route of administration, date and time of last use, and prior reactions to drugs was not completed.

29.     Further, from a review of the video surveillance, upon information and belief, the booking officer did not ask Hulon any of the drug history questions.

30.     Hulon repeatedly apologized to the officers during the booking process for being twitchy and for complaining about his handcuffs being too tight.

31.     Hulon was placed in a camera or observation cell, Cell 6-3.

32.     He was not handcuffed or restrained at any time on April 10, 2020.

33.     Hulon was not deem a risk to himself, any officer or to the operations of the jail.

34.     Hulon remained in Cell 6-3 for approximately 8 hours.

35.     According an incident report written by Defendant Worden:

"Hulon was visibly under the influence of narcotics believed to be meth. Hulon was escorted to cell 6-3 without any issues. Hulon then started taking clothes off and was pacing the cell and yelling. Hulon's behavior continued for approx. 8 hrs at which point Hulon stated he was very sweaty and hot. Sgt. Windham [sic] notified dispatch to have LFD and an Ofc transport Hulon for medical evaluation."

36.     Hulon was transferred to Sparrow Hospital by officer Ricky Spratt and arrived in the emergency department at 10:13 p.m.

37. According the medical records, Hulon admitted to using methamphetamines but was "worried that there were possibly other substances in the drug."

38. Hulon told the medical professionals at Sparrow Hospital that he last used methamphetamines the night before his arrest.

39. Hulon's urine analysis was positive for methamphetamines and ecstasy.

40. According to the medical records, Hulon was agitated and actively twitching, which was noted as "involuntary."

41. Further according to the medical records, Hulon was alert and oriented, speaking in full sentences, well-nourished, well-developed and in no distress.

42. After an examination and urine drug screen to rule out a drug overdose, Hulon was administered 3 milligrams of Ativan over the course of his 2 ½ hour stay in the hospital.

43. Two milligrams were given orally in pill form and one was given intramuscularly by way of an injection in his thigh.

44. At approximately 12:25 a.m., Hulon was medically-cleared, discharged from the hospital and released back into police custody.

45. Sometime prior to 12:25 a.m., Defendant Allman relieved officer Spratt at Sparrow Hospital.

46.     According to Defendant Allman's written report, while at Sparrow Hospital, Hulon told him "that he took meth on Thursday, he took a nap and when he awoke, he couldn't stop moving."

47.     Defendant Allman further wrote that Hulon was "thrashing" in his bed and that Hulon told him he was not doing it on purpose.

48.     Defendant Allman further wrote in his report that the nurse and officer Spratt told him that Hulon had been thrashing around and moving constantly for the past 2 ½ hours.

49.     According to Defendant Allman's report, Hulon would not cooperate and walk to his awaiting patrol car.

50.     Defendant Allman called for backup to assist in transporting Hulon back to the Jail.

51.     Two LPD officers, Katelyn Miller and De'Jeeiare Davis, responded, and assisted Defendant Allman in transporting Hulon.

52.     The officers noted in their respective reports that they "applied pressure" to in order to gain control Hulon.

53.     Ultimately, a wheelchair was used to transport Hulon to the patrol car.

54.     In his report, Defendant Allman admitted to using force to purportedly keep Hulon in the wheelchair.

55.     From the BWC's of the officers, as he was being assisted into the car, Hulon hit the back of his head on the door frame which caused him to scream: "my head, my head, my fucking head."

56.     Hulon became upset due to his head striking the door frame and he continued to complain about his tight handcuff on the way back to the jail.

57.     Hulon was lying down in the back seat, and Defendant Allman was unable to secure him with a seatbelt.

58.     Defendant Worden met Defendant Allman and Hulon at the back entrance of the Jail.

59.     Defendant Allman wrote that because Hulon's arms and legs were shaking erratically, he thought it would be easier and safer to use the wheelchair instead of walking.

60.     According to Defendant Allman's report, as Hulon attempted to sit in the wheelchair, it rolled backwards and Hulon almost fell out of it.

61.     Defendant Allman wrote that Hulon would not place his feet on the foot rest and slid forward almost falling out of the wheelchair.

62.     Defendant Allman then "assisted" Hulon back into the wheelchair.

63.     Hulon apologized for not being able to control his movements.

64.     While escorting Hulon into the jail, the video footage recorded Hulon smashing the right side of his face on the metal door frame between the vestibule and the room where the elevator was located.

65.     The officers' actions cannot be seen from this view. The video footage from the "garage lobby camera" which would have provided the clearest view of this incident, is missing three (3) seconds: 1:02:18 through 1:02:21.

66.     This are the precise seconds that Hulon struck his head and face.

67.     From another camera view, however, Hulon's head and face can be seen bouncing off of the door frame and he almost fell down.

68.     The loud "thump" can be heard on the audio and Hulon groggily said: "hit my cheekbone" to which Worden or Allman replied: "I know."  This occurred at 1:02:20 a.m.

69.     This camera angle does not show how the blow to his head and face occurred.

70.     None of the Defendant officers' reports mentioned this blow to his cheekbone and face that caused obvious injuries that required medical attention.

71.     According to the video, at 1:04:25 a.m., Defendants Worden and Allman escorted Hulon to cell 6-2 with his hands cuffed behind his back and his ankles shackled.

72.     It is uncontested that Hulon was an unarmed detainee in police custody.

73. Defendants Wright and Guerra entered cell 6-2 with Defendants Worden and Allman.

74. According to the LPD policy manual, cell 6-2 is an "observation cell." All actions were recorded inside of the cell.

75. Defendant Windom was the Jail supervisor or Sergeant on duty on April 11, 2020, when Hulon returned to the Jail from the hospital.

76. From the records, Defendant Windom observed the activities inside of cell 6-2 from the "main lockup work area."

77. Defendant Windom wrote:

"It appeared to me from the video feed that his "tweaking" was worse than when I had him sent to Sparrow. Hulon was taken directly back to cell 6-2 with Sgt Guerra, Officer Alman [sic], and detention officers Wright and Worden.

The decision was made by the staff dealing with Hulon to place him in a restraint belt. I was observing from the main lock up area on the video as someone has to stay in the work area to monitor the other inmates."

78. At 1:04:33 a.m., while Defendants Allman, Worden and Guerra held Hulon, who was handcuffed with his hands behind his back, Defendant Wright unshackled Hulon's ankles.

79. Hulon who was visibly under the effects of methamphetamines and ecstasy ("drugs" hereinafter), was combative, struggling, panting, and complaining of pain, stating: "you're hurting my hands. . ." and "It hurts bad . . ."

80.     From the video, Hulon appeared to have injuries to the right side of his head, brow and cheek.

81.     Instead of simply uncuffing him and leaving him in the cell to relax and calm down, without restraints, where he posed no risk of harm to himself or other, the defendants, upon information and belief, the Defendant officers decided to punish Hulon, by placing him in a waist restraint belt.

82.     There was no penological justification or legitimate goal for placing Hulon in the cell in handcuffs or a waist restraint belt, other than to punish him for his continued restless behavior.

83.     At 1:05:30 a.m., a Defendant officer instructed Hulon to get on his knees.

84.     Hulon who had just struck his head, face and eye, did not appear to comply with the officer's instructions.

85.     It is reasonable to conclude that Hulon did not have the capacity to understand commands at that time.

86.     At 1:05:14 a.m., Defendants Worden, Allman, Wright and Guerra forced Hulon face down, onto his chest, and onto the ground.

87.     At the 20:46 mark, Defendant Allman's BWC captured the sound of Hulon's head smashing against the cinder block cell wall.  The sound was loud and distinctly the sound of a person's skull hitting concrete.

88.     After the 3rd blow to his head while under the care and custody of Defendants, Hulon was forced onto his chest, and on his large stomach.

89.     Hulon's hands were cuffed behind his back.

90.     Defendant Allman held down Hulon's knees, legs and feet.

91.     Defendant Worden held down Hulon's upper body by compressing his neck, chest and torso, while Defendant Guerra attempted to remove Hulon's hand cuffs.

92.     At 1:05:42 a.m., a gasping Hulon said: "I can't breathe . . .can't breathe . . ."

93.     Hulon was panting and gasping for air.

94.     One of the officers replied: "Yes, you can . . ."

95.     At the 21:22 mark on Defendant Allman's BWC, as they were trying to remove his handcuffs, one of the Defendant said: "do you want him out?" to which Defendant Worden replied: "I think he should a stay in. I'm ready to put him in a restraints [inaudible] . . . He's been like this.  He's been like this for 12 hours."

96.     Hulon was 6 feet tall and weighed 240 lbs.; considered obese with a BMI of 32.5.

97.     The known risk of positional asphyxia for someone who is overweight, has a large stomach and is under the influence of drugs, methamphetamine, is much greater for someone who does not have those conditions.

98.     That the Defendant officers knew, or should have known through their training, their own policies and procedures, and/or from the clearly established law, that death by positional asphyxia for Hulon, where they have actual notice that he is under the influence of methamphetamine and had been exerting himself for at least 8 to 10 hours, is highly foreseeable if they place him in a prone position and exert pressure on him for 5 ½ minutes.

99.     At 1:06:04 a.m., Defendant Wright joined Defendants Worden and Allman, and held Hulon down by kneeling on the middle of his back, then rolling forward, so his full body weigh was compressing Hulon's chest and torso.

100.    At 1:06:08 a.m., Hulon said: "I'm passing out . . ."

101.    At 1:06:16 a.m., from the video, Defendant Worden, holding Hulon down by his neck and shoulders, extended his left leg out, braced it on the ground, and applied additional compressional force upon Hulon, who was panting, grunting and struggling to breathe.

102.    At 1:06:59 a.m., a breathless Hulon uttered: "I can't breathe, I can't really not breathe now . . . "

103.    At 1:07:00 a.m., Defendant Guerra began to replace Hulon's handcuffs with a waist restraint belt while the other Defendants continued to pin him to the ground on his stomach and chest, compressing his lungs and restricting his ability to breathe.

104.    Hulon was panting and gasping for air.

105.    From a review of the video, 1:07:04 a.m., was the last voluntary movement from Hulon.[2]

106.    The Defendant officers continued to pull, tug and tighten the waist restraint belt on a motionless Hulon, who was agonal breathing, i.e., the last breaths before death.

107.    At 1:09:54 a.m., the last sounds were heard from Hulon as captured on the audio recording from cell 6-2.

108.    At 1:10:24 a.m., the Defendant officers, still restraining Hulon face-down with their cumulative body weight, finally secured the restraint belt around a motionless Hulon's waist.

109.    According to the video, the Defendant officers rolled Hulon on his side at 1:10:37 a.m.; 3 ½ minutes after his last movement.

110.    Hulon was face down on his stomach and chest, for 5 minutes and 23 seconds.

111.    During that 5 minutes and 23 seconds, Hulon was forcefully held down by at least three (3) of the four (4) Defendant officers in cell 6-2.

---

[2] In his report, Defendant Windom wrote: "Hulon was face down with the staff attempting to put the belt on him.  I noticed Hulon stopped resisting.  The staff working with him turned him over and sat him up"

112.    At 1:10:40 a.m., one of the Defendant officers asked: "Is he sleeping?"

113.    It is clear from Defendant Allman's BWC that Hulon's eye are open. He was not sleeping.

114.    Hulon was not breathing.

115.    At 1:11:33 a.m., Defendant Allman checked to see if Hulon was breathing or had a pulse.  Upon discovering that he had neither, Defendant Allman requested a medic.

116.    After the Defendant officers discovered that Hulon was not breathing, and did not have a pulse, they unreasonably delaying in starting CPR.

117.    The video further shows that once the Defendant officers started CPR, they did it incorrectly, failing to give any rescue breaths when eight (8) were advised by the AED machine.

118.    The Defendant officers did not perform any rescue breathing on Hulon.

119.    The Defendant officers did not use a Bag Valve Mask ("BVM") or a CPR mouth barrier, to administer oxygen; standard equipment found in first aid bags.

120.    The first responders arrived at cell 6-2 at 1:19:18.

121.    During the approximately 8 minutes from the time that the Defendant officers determined that Hulon was not breathing and had no pulse, to the time that

the first responders arrived, no Defendant officer performed any rescue breathing and/or administered any oxygen.

122. The first responders attempted life-saving measures, but according to the records, by the time Hulon arrived at the emergency department, he had been without a heartbeat for 38 minutes.

123. Hulon never regained consciousness.

124. Hulon was pronounced dead at 2:12 a.m. at Sparrow Hospital. He was 54 years old.

125. The medical records state that Hulon suffered cardiac arrest and anoxic brain injury.

126. The medical records further note: "Per EMS, patient got into an altercation with police in custody. Patient was placed in waistband restraints, became unresponsive. Bystander CPR was immediately started."

127. The Ingham County Medical Examiner listed his cause of death as positional asphyxia.

128. The Medical Examiner further listed the manner of death as homicide.

129. Further the Medical Examiner noted the following blunt force injuries:

    a.    Abrasion of the right forehead;
    b.    Contusion of right brow;
    c.    Abraded contusion of the right cheek;
    d.    Subcutaneous contusion of right lower back;
    e.    Abrasions of wrists and ankles (consistent with restraint injuries); and

f.   Scattered additional abrasions and contusions of torso and extremities.

130.   The Michigan State Police ("MSP") referred the matter to Michigan Attorney General's ("AG") office to determine whether to criminally prosecute the four (4) Defendant officers, however, on April 9, 2021, the AG declined the MSP's request for a warrant.

131.   Defendant City of Lansing, through its final policy maker for the LPD, Chief Green, and its CEO and Supervisor of the LPD, Mayor Andy Green, issued a misleading press release on April 11, 2020 stating that a man died in the jail after experiencing "recurring medical issues" when they knew that he died after being restrained and pinned down by four (4) officers in the jail.

132.   Defendant, City of Lansing, failed to conduct an investigation into the death of Hulon pursuant to the City's "Critical Incidents Guidelines" and its "Police Employee Involved in Critical Incident" policy and procedure, and violated the following their own policies and procedures by:

a.   Failing to place the individual Defendants on administrative leave for a minimum of 72 hours so their state of well-being can be monitored before they are cleared for duty;

b.   Failing to keep the individual Defendants on administrative leave until the completion of the Investigation and prosecutor review;

c.   Prior to the individual Defendants returning to duty, failing a undergo a mandatory debriefing by a health care professional to determine their fitness for duty.

d.   Failing to release any information about the case by including the names of the involved officers by the Chief or designee at any time; and

e.   The LPD Internal Affairs investigators to conduct an internal review of the incident to ensure that the involved officers acted within LPD's policies and procedures where the prosecutor (MSP) concluded its investigation in July of 2020.

133.   That upon information and belief, no investigation into the conduct of the individual officers or the death of Hulon was conducted by Defendant City.

134.   Upon information and belief, no documentation of any investigation conducted by Defendant City.

135.   Upon information and belief, no corrective or disciplinary action against the individual Defendants was issued by Defendants City.

136.   Upon information and belief, no corrective or disciplinary action against the individual Defendants was recommended by Defendants City.

137.   Upon information and belief, no additional training for the individual Defendants was required by Defendants City.

138.   Upon information and belief, no additional training for the individual Defendants was recommended by Defendants City.

139.   On March 17, 2021, Chief Daryl Green told reporters that one of the problems at the jail is an "excessive amount" of turnover and that the jail is at "the

lowest staffing possible," in an article entitled: "Officials have tried to close Lansing's lockup for decades. Despite concerns, it remains open."

140. Chief Green further told reporters that if an employee goes on leave or an extended absence, "it leaves a more permanent hole – it generates overtime."

141. Instead, approximately two (2) months after Hulon's death by asphyxiation, Green and Schor marched in a protest for George Floyd both "taking a knee" for 8 ½ minutes representing the time it took for Floyd to asphyxiate and die.

142. Defendants City knew that Hulon died in the same manner and were complicit misleading the media, Plaintiff, her family and the public.

143. Defendants City is subject to municipal liability as more fully described herein.

144. Defendants, Windom, Guerra, Allman, Wright and Worden, are not entitled to qualified immunity as Hulon's right to be free from excessive force and cruel and unusual punishment, were unequivocally established, and the amount of force used was clearly excessive based upon the totality of the circumstances.

145. The prohibition against creating asphyxiating conditions by applying substantial, significant, or prolonged pressure upon an unarmed, handcuffed, detainee, who presents a minimal safety risk was clearly established in the Sixth Circuit as of August 2007 in *Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007).

146.   Since *Griffin,* numerous Sixth Circuit cases have reaffirmed the law notifying Defendants that their conduct was unlawful and unconstitutional.

147.   Further, Defendant City's own policies and procedures regarding the use of handcuffs and restraints devices put the Defendant officers on actual notice that their conduct was so reckless that serious injury or death was likely to occur.

148.   In addition to failing to supervise and monitor his subordinate Defendant officers during the incident, Defendant Windom, failed to intervene and to stop the use of excessive use of force that resulted in the death of Hulon.

149.   Further, the Defendant officers failed to timely and properly perform CPR and basic life support in violation of Hulon's constitutional rights as more fully explained below.

150.   The acts of the Defendant officers were intentional, malicious, reckless, grossly negligent, and undertaken with deliberate indifference to and callous disregard for Hulon's health and wellbeing, entitling his estate to punitive damages.

151.   The acts of the Defendant officers were undertaken in conformity with the customs, policies and practices of the Defendant City's police department and administration, subjecting Defendant City, through its final policymakers, to municipal liability for failure to properly hire, train, supervise, monitor, staff and/or discipline the officers in the Department.

152. Further, Defendant City is subject to liability under 42 U.S.C. §1983 as officials with final decision making-authority and charged with a duty to know and act upon unconstitutional conduct.

153. By failing to investigate the conduct of the individual defendants, Defendant City ratified their unconstitutional conduct thereby subjecting Defendant City to municipal liability.

154. Further Defendant City had a custom or policy of failing to investigate wrongful death and excessive force claims in the jail prior to this incident, as more fully described in Count V below.

155. The additional acts and omissions, *inter alia*, of the leading to municipal liability are as follows:

    a.    Failing to train officers on the proper use of handcuffs and restraint devices and the known risks of positional and/or compressional asphyxia;

    b.    Failing to train officers on the improper restraint of detainees in a prone position, increasing the risk if injury and death by positional and/or compressional asphyxia;

    c.    After the jail death of Edward Swans, Jr., (which also occurred in cell 6-2) claiming to have an alleged training program regarding the proper use of handcuffs and restraint devices and the known risks of positional and/or compressional asphyxia, but deliberately failing to implement it;

    d.    Failing to properly train officers on the use of force continuum and on the principle that the elevation of the continuum must proceed on a careful and staged basis, with the use of force by

the officers never more than one level of force above that demonstrated by the citizen who is the subject of government action, especially an unarmed detainee;

e. Failing to properly train officers in basic life support and/or CPR;

f. Condoning, authorizing, tolerating and/or ratifying a custom or practice of deliberate indifference to detainees' serious medical needs by willfully and intentionally failing to perform CPR;

g. Condoning, authorizing, tolerating and/or ratifying a custom or practice of the use of excessive force, including officers' failure to intervene in excessive force, and improper restraint of detainees increasing the risk of injury and death by positional and/or compressional asphyxia;

h. Condoning, authorizing, tolerating and/or ratifying a custom or practice of the use waist restraints in jail cells on detainees for no legitimate goal or penological justification;

i. Condoning, authorizing, tolerating and/or ratifying a custom or practice of restraining detainees face-down in jail cells where they present no risk of harm to any officer, and serve no legitimate goal or penological justification;

j. Condoning, authorizing, tolerating and/or ratifying a custom or practice of encouraging and permitting collusive statements by involved officers, including, but not limited to: failing to file complete and accurate reports, filing misleading reports, making misleading statements, and obstructing or interfering with an investigation; and

k. Any other custom, policy or practice that becomes known through discovery.

156. These acts and failures to act pursuant to the customs, policies and

practices of the Defendant City, its administration, LPD, and its individual officers,

directly led to the use of excessive force against Hulon and deliberate indifference to his serious medical needs, in violation of his Fourth and Fourteenth Amendment rights to be free from excessive force, and inhumane conditions of confinement, giving rise to municipal liability which is not subject to qualified immunity.

<u>**COUNT I**</u>

<u>**42 U.S.C. §1983 – VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS -EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE TO MEDICAL NEEDS CAUSING WRONGFUL DEATH**</u>

**(AGAINST DEFENDANTS WINDOM, GUERRA, ALLMAN, WORDEN, AND WRIGHT)**

157.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

158.   At all times relevant, Hulon had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection from excessive force pursuant to the Fourth Amendment to the United States Constitution.

159.   As a pretrial detainee, the substantive due process clause of the Fourteenth Amendment further afforded Hulon the right to adequate medical care, and the deprivation of necessary medical care was an unconstitutional form of punishment.

160.  At all times relevant, as police officers acting under color of law, Defendants Windom, Guerra, Allman, Worden, and Wright ("Defendant officers") were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

161.  In violation of Hulon's clearly established, constitutionally-protected rights to be free from excessive force, cruel and unusual punishment, and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant officers subjected Hulon to excessive force and cruel and unusual punishment; thereby inflicting horrendous personal injuries upon him, including death.

162.  In violation of Hulon's clearly established, constitutionally-protected rights to be free from excessive force, cruel and unusual punishment and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant officers violated Hulon's rights by the following conduct:

> a.  Defendant officers made the decision to apply a waist restraint on Hulon, an unarmed detainee, for no legitimate goal or penological  purpose, the only purpose was to punish Hulon;
>
> b.  Defendant officers caused Hulon, and restrained detainee, to strike his head and face, on three (3) occasions causing painful and visible injuries and provided him no medical attention;

c.  Defendant officers deliberately ignored Hulon's cries of pain and statements that they had hurt him when he was first moved back into cell 6-2;

d.  Defendant officers restrained Hulon face down on his stomach and chest with his hands cuffed behind his back where they knew, or should have known had they been properly trained, would restrict his breathing, in in violation of Lansing Police Department Policy 500.3-Use of Handcuff and Restraint Devices;

e.  While prone, Defendant officers applied their cumulative body weight upon him when they knew was "tweaking" from drugs, and knew, or should have known had they been properly trained, that their actions posed a substantially high risk of positional or compressional asphyxia and death;

f.  Defendant officers failed to enter an ALERT in the jail record at the time of booking or during the 8 hours period when Hulon was allegedly "tweaking", for Sudden Custody Death Syndrome Risk or a "SCDS RISK" in violation of Lansing Police Department Policy700.31 – Alert Review at Booking;

g.  Defendant officers continued the restraint of Hulon, in a prone position, despite him stating that he was "passing out" and "I can't  breathe" and "I can't really not breathe" for 5 minutes and 23 seconds;

h.  Defendant officers continued the restraint of Hulon, in a prone position, for after he had stopped moving and made his last agonal breath sound;

i.  Defendant officers willfully refused to perform rescue breathing for over 8 minutes in deliberate indifference to his serious medical needs in violation of Hulon's Fourteenth Amendment right to adequate and necessary medical care;

j.  None of the Defendant officers intervened or attempted to stop the restraint of Hulon, even after he said he was "passing out" and "I can't breathe" and "I can't really not breathe" for 5

minutes and 23 seconds including Defendant Windom, who was watching the events in Cell 6-2 from the main lock up work area;

k.    Defendant officers wrote misleading reports in an attempt to cover-up and/or obstruct the investigation;

m.    Defendant officers misrepresented what occurred to paramedics who responded to the jail; and

l.    Any other conduct that becomes known through discovery.

163.    The above conduct in the foregoing Paragraph, was objectively unreasonable, constituted the use of excessive force, was cruel and unusual punishment, and reflected the unnecessary and wanton infliction of pain.

164.    The Defendant officers conduct was taken in deliberate indifference to Hulon's objectively serious medical needs for which each individual Defendant officer had subjective knowledge of the serious medical need and risk of harm it presented.

165.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendant officers are liable to Plaintiff for all damages allowable under federal law and Michigan damages statutes.  To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such in adequacies.

166.    The conduct of Defendant officers was and remains extreme and outrageous subjecting them to punitive damages.

167.    As a direct and proximate result of Defendant officers' violations of Hulon's constitutionally-protected rights, Hulon and Plaintiff suffered damages as more fully explained in Paragraphs sixteen (16) through nineteen (19) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT II

### 42 U.S.C. § 1983 – MUNICIPAL LIABILITY
### DELIBERATE INDIFFERENCE TO UNCONSTITUTIONAL CUSTOMS, POLICIES AND PRACTICES AND SYSTEMATIC FAILURE TO HIRE, TRAIN, SUPERVISE AND DISCIPLINE OFFICERS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

### (AGAINST DEFENDANT CITY)

168.    Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

169.    42 U.S.C. § 1983 states:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the

constitution and law shall be liable to the party injured in
an action at law, suit in equity, or other appropriate
proceeding for redress . . .

170. Defendant City, through its final policymakers and/or supervisors, had

an obligation to hire, train, supervise, and monitor, its agents and employees,

including the individual Defendants named herein, to ensure that the constitutional

rights of Hulon and similarly situated citizens were not violated.

171. Defendants City had an obligation to investigate, report and discipline

its officers for the use of excessive force, including the individual Defendants named

herein, to ensure that the constitutional rights of Plaintiff and similarly situated

citizens were not violated.

172. Defendant Windom, the shift commander/supervisor, for the jail,

pursuant to the customs, policies and practices of the Defendant City, was

responsible for all decisions related to the use of detainee restraints in the Jail.

173. Defendant Windom was responsible for ensuring that all detainees in

the Jail received appropriate medical treatment and was responsible for the safe and

humane treatment of all detainee pursuant to City of Lansing Police Department

Policy 500.4 – Detention of Adults and Juveniles

174. With deliberate indifference to the rights of citizens to be free from

excessive force, and cruel and unusual punishment, the City of Lansing police and

detention officers, Defendant City, has ongoingly condoned, encouraged, tolerated,

ratified and acquiesced to a dangerous environment of police and jail misconduct stated in detail in Paragraphs one hundred fifty-one (151) through one hundred fifty-six (156).

175.   Defendant City's customs, policies and practices were a moving force behind the constitutional violations that caused Plaintiff's injuries and damages in Paragraphs sixteen (16) through nineteen (19) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT III

## ASSAULT AND BATTERY CAUSING WRONGFUL DEATH

### (AGAINST DEFENDANTS GUERRA, ALLMAN, WORDEN AND WRIGHT)

176.   Plaintiff incorporates by references each of the allegations contained in the previous paragraphs as though fully set forth herein.

177.   Defendants, Guerra, Allman, Worden and Wright, made an intentional and unlawful threat or offer to do bodily injury to Hulon.

178.   Defendants' threat was made under circumstances that created in Hulon a well-founded fear of imminent peril.

179.    Defendants had the apparent present ability to carry out the act if not prevented.

180.    Defendants thereafter did complete the violent process.

181.    First, by Defendants causing Hulon to strike and hit his head and face, on three (3) occasions after leaving Sparrow Hospitals, causing visible injuries.

182.    Second, by Defendants during the unconstitutional restraint, using excessive force, and ultimately Hulon's death by positional or compressional asphyxia.

183.    As a direct and proximate result of Defendants' assault and battery of Hulon, Plaintiff sustained the injuries and damages as fully explained in Paragraphs sixteen (16) through nineteen (19) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT IV

## GROSS NEGLIGENCE, WILLFUL AND WANTON MISCONDUCT CAUSING WRONGFUL DEATH

## (AGAINST THE DEFENDANTS, WINDOM, GUERRA, ALLMAN, WORDON AND WRIGHT)

184.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein

185.   Defendants owed Hulon a duty to use ordinary care to ensure his safety and freedom from excessive force and cruel and unusual punishment, and other harms as described above.

186.   As Hulon had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including his right to personal safety and bodily integrity, as well as protection excessive force and cruel and unusual punishment, pursuant to the Fourth Amendment to the United States Constitution, the Defendant officers are not entitled to qualified immunity.

187.   Further, the Defendant officers are not entitled to governmental immunity under Michigan law, MCL §691.1407 *et seq*. as their conduct amounted to gross negligence, and/or willful and wanton misconduct.

188.   Defendants' conduct demonstrated a willful disregard for precautions to ensure Hulon's safety.

189.   Defendants' conduct demonstrated a willful disregard for substantial risk to Hulon.

190.   Defendants breached their duties owed to Hulon and were grossly negligent in that the acts committed by Defendants were done with reckless

disregard to Hulon's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to him.

191. As a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, state and federal law, Plaintiff suffered injuries and damages as fully detailed in Paragraphs sixteen (16) through nineteen (19) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT V

## 42 U.S.C. § 1983 – MUNICIPAL LIABILITY AUTHORIZING, DIRECTING, APPROVING AND CONDONING SUBODINATE'S FAILURE TO HIRE, TRAIN, SUPERVISE, DISCIPLINE AND INVESTIGATE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS ("RATIFICATION THEORY")

### (AGAINST DEFENDANT CITY)

192. Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

193. Pursuant to the Lansing City Charter ("Charter"):

> The Mayor shall be the chief executive officer of the City of Lansing and shall devote full time to the service of the City. The Mayor shall exercise all the powers and duties granted to the Mayor by law or this Charter.

Article 4, Chapter 1, Section 4-101- Mayor, City of Lansing City Charter.

194. Further, pursuant to the Charter, Mayor Andy Schor, at all times relevant, as the Mayor:

> Shall exercise supervision and coordination over the several departments of government, and see that the laws, ordinances, and regulations of the City are enforced and for that purpose, the Mayor shall be a conservator of the peace. The Mayor may exercise within the City the powers conferred upon sheriffs to suppress disorder and enforce the laws of the state and the ordinances and regulations of the City.

Article 4, Chapter, 1, Section 4-102- Obligations of Leadership, Charter.

195. The LPD is a department of government within the meaning of the Charter and Mayor Andy Schor ("Schor"), at all times relevant, was the final supervisor, coordinator and authority of, and over, the LPD, including police chief Daryl Green and the individual Defendant officers; his subordinates.

196. That Schor, by reason of being the duly-elected Mayor of the City of Lansing, in his official capacity, at all times relevant, was acting under the color of state law.

197. That Schor pursuant to the Charter, at all times relevant, was granted final decision-making authority concerning the supervision of the LPD.

198. That Chief Daryl Green ("Green"), at all times relevant, was the final policy-maker with respect to LPD policies and practices, and all hiring, training, supervision, and disciplinary decisions of LPD police and detention officers.

199.   That Defendant City is subject to municipal liability for authorizing, directing, approving, and condoning subordinate's failure to fire, train, supervise, and discipline officers, including the Defendant Officers.

200.   That Defendant City had the duty to know and to act upon the Defendant Officers' unconstitutional conduct which includes the duty to conduct a meaningful investigation and to correct the unconstitutional conduct.

201.   That Defendant City had a custom of failing to investigate, discipline and terminate its employees who violated the constitutional rights of pre-trial detainee in the jail.

202.   That the following incidents and failures to investigate that demonstrate a pattern that amounts to a custom:

- In 2015, Jessica Spalding died after being incarcerated in the Jail for two days. During booking, Ms. Spalding advised that she had been using heroin recently. She also reported that her hand was hurting, and that she was experiencing a high fever. Ms. Spalding later asked to be transported to a hospital for treatment, but her request was denied. Soon thereafter, she began vomiting and experiencing diarrhea. Despite exhibiting these and other symptoms, Ms. Spalding received  no medical care.  Ms. Spaulding was transferred to the Ingham County Jail where she died one day later from severe, complications of heroin withdrawal. The Defendant City's employees failed to provide medical care and treatment to Spalding which was a proximate cause of her death.

- In 2013, Joseph Manning died in the Jail after the detention officers failed to respond to his cries for help following a suicide attempt. Manning was found unconscious on the floor of his cell.  The

Defendant City's employees failed to provide medical care and treatment to Manning which was a proximate cause of his death.

- In 1996, Edward Swans died in an extremely similar manner to Hulon. He was restrained on his stomach in Cell 6-2 after failing to obey the detention officers' orders. The cause of Swans' death was positional asphyxia. Defendant City's employees used excessive force and failed to provide medical attention to Swans which was a proximate cause of his death.

- In 1992, Richard Vines died in the Jail after drinking windshield wiper fluid. The officers thought he was drunk and sleeping if off, and failed to seek medical attention for him. The Defendant City's employees failed to provide medical care and treatment to Vines which was a proximate cause of his death.

203. That in the four known instances that occurred prior the Hulon's death, the City failed to conduct a meaningful investigation meant to uncover the truth and no officers were disciplined or terminated as a result.

204. That the four known instances of the Defendant City's failure to investigate are comparable to the instant claim as they all involve an a pretrial detainees under the influence of drugs and/or mentally-incapacitated, who died while incarcerated at the Jail.

205. That the Defendant City's failure to conduct a meaningful investigation and discipline or terminate its employees is evidence of a policy or custom of systematically failing to investigate excessive force and/or failing to provide medical attention.

206. That Defendant City knew or reasonably should have known, that Hulon died in the jail after being forcibly restrained on his stomach by the Defendant officers on April 11, 2020; the date the City released the statement to the media.

207. That Defendant City, knew or reasonably should have known, that Hulon died in the jail after being forcibly restrained on his stomach by the Defendant officers on April 11, 2020, when the MSP began their own investigation and requested copies of all surveillance footage and BWC.

208. That Defendant City, knew or reasonably should have known, that the Defendant Officers failed to provide medical attention to Hulon, by failing to properly perform CPR and administer rescue breaths or oxygen, when the MSP began their own investigation and requested copies of all surveillance footage and BWC.

209. That the Defendant City knew or reasonably should have known, that Defendant officers' conduct was unlawful and/or unconstitutional when the MSP referred the matter to the Michigan Attorney General's Office to determine if criminal charges should be brought against the Defendant officers.

210. That Defendant City knew or reasonably should have known, that the Defendant officers' conduct violated the Fourth and Fourteenth Amendments' prohibitions against excessive force and deliberate indifference to serious medical needs based upon clearly established case law in the Sixth Circuit.

211.   That Defendant City had actual notice that the Defendant officers' conduct was unconstitutional based upon the case of *Edward Swans, Jr.* vs. City of Lansing, *supra.*

212.   That Defendant City further knew or reasonably should have known, that the force used by the Defendant officers was excessive and in violation of the Fourth Amendment and the LPD's policies and procedures regarding the use of handcuffs and restraint devices.

213.   That Defendant City, through its final policymakers, Schor and Green, is subject to municipal liability by failing to conduct a meaningful investigation into the death of Hulon, thereby ratifying the unlawful and/or unconstitutional conduct of the Defendant officers.

214.   Defendants, City, through its final policymakers, Green and Schor, failed to conduct a meaningful investigation into Hulon's death by the following acts and omissions:

   a.   Issuing a misleading press release on April 11, 2020 stating that Hulon died in the jail after experiencing "recurring medical issues" when they knew that he died after being restrained and held down by four (4) officers in the jail;

   b.   Failing to conduct an investigation into the death of Hulon pursuant to the City's "Critical Incidents Guidelines" and its "Police Employee Involved in Critical Incident" policy and procedure;

c.   Failing to place the individual Defendants on administrative leave for a minimum of 72 hours so their state of well-being could be monitored before they were cleared for duty;

d.   Failing to keep the individual Defendants on administrative leave until the completion of the Investigation and prosecutor review;

e.   Prior to the individual Defendants returning to duty, failing a undergo a mandatory debriefing by a health care professional to determine their fitness for duty;

f.   Failing to release any information about the case by including the names of the involved officers by the Chief or designee at any time;

g.   Failure of the LPD Internal Affairs investigators to conduct an internal review of the incident to ensure that the involved officers acted within LPD's policies and procedures where the MSP concluded its investigation in July of 2020;

h.   Misleading City Council and the public claiming that they did not know how Hulon died when the video surveillance and body worn camera had been reviewed;

i.   Failing to discipline any of the involved officers;

j.   Failing to retrain any or the involved officers;

k.   Failing to document any investigation or review process or procedure;

l.   Failing to make or recommend any changes in policy, procedure or training, and

m.   Any other failures that become known through the course of discovery.

215. That by the above acts and omissions, Defendants City, Schor and Green, approved, condoned, and acquiesced the unlawful and unconstitutional conduct of the Defendant officers.

216. That the above acts and omissions amount to ratification of the Defendant officers' constitutional violations of Hulon's rights, and is the official policy of the Defendant City subjecting it to 42 U.S.C. §1983 liability.

217. That a causal link exists between the Defendant City's failure to conduct a meaningful investigation into the four prior instances and the instant matter.

218. That the Defendant City's custom or policy of failing to conduct a meaningful investigation as stated above, was the moving force behind the violations of Hulon's Fourth and Fourteenth Amendment rights to be free from excessive force and to received adequate and proper medical attention while a pretrial detainee.

219 That as a direct and proximate result of Defendants' violation of Plaintiff's constitutionally-protected rights, state and federal law, Plaintiff suffered injuries and damages as fully detailed in Paragraphs sixteen (16) through nineteen (19) above.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

a.  compensatory and consequential damages, allowable under the Michigan Wrongful Death Statute and/or Survival Statute;

b.  economic losses on all claims allowed by law;

c.  special damages in an amount to be determined at trial;

d.  punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

e.  attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

f.  pre- and post-judgment interest at the lawful rate; and

g.  any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

Respectfully submitted,

Buckfire Law Firm


By:   /s/ Jennifer G. Damico
      Jennifer G. Damico (P51403)
      Attorneys for Plaintiff
      29000 Inkster Road, Suite 150
      Southfield, MI 48034
      (248) 569-4646/ fax (248) 569-6737
April ___, 2021      jennifer@buckfirelaw.com